THE STATE OF NEW JERSEY, PLAINTIFF IN ERROR, v.
GEORGE M. BREWSTER, DEFENDANT IN ERROR.

Argued June 20, 21, 1916—Decided December 4, 1916.

1.  Process to appear before a legislative committee, regular on its
    face, issued by the chairman of such committee under a general
    authority conferred upon him by the committee, either expressly
    or by parliamentary usage, and either with or without specific
    authority in the particular case, is a summons to appear before
    such committee, the willful disregard of which is made a misde-
    meanor by *Pamph. L.* 1895, *p.* 162.   *Comp. Stat., p.* 2241, §§
    67, 68.
2.  The failure of the defendants to appear at the place named in
    the subpœna was the culminating factor in the completion of
    their offence, and the defendants were then subject to indictment
    in that county, though they resided elsewhere.   *Quære:* Whether
    such process is subject to collateral attack?

On appeal from the Supreme Court, whose opinion is re-
ported in 88 *N. J. L.* 551.

For the state, *Martin P. Devlin* and *Charles H. English.*

For the defendant in error, *William B. Mackay, Jr.,* and
*Gilbert Collins.*

The opinion of the court was delivered by

MINTURN, J.   In the session of the year 1914 the legisla-
ture passed a resolution empowering and authorizing the joint
appropriations committee to investigate the expenditure of
state moneys, with reference particularly to the departments
of education, public roads and charities and corrections, and
to report at the following session of the legislature.

The resolution empowered the committee to issue subpœnas
for the attendance of witnesses, and to sit after the adjourn-
ment of the legislature at any place in the state which they
might designate.

Pursuant to the mandate of this resolution, the committee sat on the 5th day of December, 1914, in the senate chamber, in Trenton, for the purpose, *inter alia,* of taking the testimony of George M. Brewster and Walter Scott, the defendants, to whom had been previously issued subpœnas in due form, commanding them, respectively, to appear before that body, upon that day, at eleven o'clock in the forenoon. Instead of appearing in person, the defendants appeared by counsel, who informed the committee that he had advised the witnesses not to appear, because, as he conceived, the committee lacked the power to require the witnesses to appear.

The failure of the defendants to appear resulted in their indictment by the Mercer county grand jury, and their trial and conviction by the Mercer Sessions, from which judgment a writ of error was taken to the Supreme Court, where the judgment of conviction was reversed. The legal correctness of this reversal is before us upon this writ of error.

Prior to the trial, a motion to quash the indictment was made and refused by the Supreme Court. *State v. Brewster,* 87 *N. J. L.* 75; 93 *Atl. Rep.* 189.

The indictment is based upon the violation of the provisions of the act entitled "An act respecting the examination of witnesses before legislative committees, and providing for the punishment of witnesses refusing or neglecting to appear or give evidence before such committees." 2 *Comp. Stat., p.* 2241, §§ 67, 68; *Pamph. L.* 1895, *p.* 162.

The first section of the act deals generally with the obligations of witnesses, testifying before either house of the legislature, or any authorized committee of either house. The second section concerns the situation presented by this inquiry, viz.: "That if any witness summoned to appear before any such committee shall willfully neglect or refuse to appear in obedience to the summons, or shall refuse to be sworn or affirmed, he shall be deemed guilty of a misdemeanor."

The case came before the Supreme Court under the one hundred and thirty-sixth section of the Criminal Procedure act, and was there argued on the exceptions taken at the trial,

and the specifications of causes filed and served upon the state, in accordance with the provisions of the one hundred and thirty-seventh section of the act.

It is insisted here by the state that in dealing with the case, the Supreme Court supported its judgment upon a question not raised by the bill of exceptions, or by the specifications, and therefore upon a point not argued by either side in that court.

It must suffice to say, in answer to this contention, that in view of the public importance of the questions in controversy, and in view of the generality of the assignments and reasons presented by the defendants for reversal, we are not inclined to base our determination upon a severely rigorous adherence to any rule of judicial procedure.

The Supreme Court based its determination upon two grounds—*first,* that no place of meeting was designated by the committee, and *secondly,* that the committee never authorized the issuing of a summons to the defendants.

The questions argued by the defendants we shall consider in their order of presentation.

It is insisted, primarily, that there was no joint appropriations committee of the legislature for the year 1914, as alleged in the indictment. The Supreme Court quite aptly disposed of this contention by deciding that the facts showed that there was a committee on appropriations, appointed for each house, and that together they acted as and constituted a joint appropriations committee.

We might go further and declare that the courts will take judicial notice of the fact that the joint appropriations committee constitutes the *modus operandi,* under legislative practice, for the consideration and determination of both the propriety and *quantum* of the appropriations annually made by the legislature to each department of the state government; and that, if such a committee did not in fact exist in the year 1914, the onus of showing that fact was upon the defendants and not upon the state of proving it affirmatively. 1 *Greenl. Ev.* 8; 2 *Rice Ev.* 35; 16 *Cyc.* 907, and cases.

It is further contended that no place of meeting was designated by the committee.    The joint resolution conferred power upon the committee "to sit at any place in this state which they may designate."

In pursuance of that power they sat at Trenton, and the process served upon the defendants required them to appear there.

The record shows that the committee met at Trenton, upon the return day of the subpœna, and that the defendants failed to appear.    It may be that the minutes do not show any record of adjourned meetings from place to place, or even any resolution to convene at Trenton.    The committee were acting under parliamentary rules and usages, and it was within the power of the chairman to convene them at Trenton, or elsewhere within the state, in the absence of a continuing resolution fixing the place of meeting.    *Cush. Prac. Leg. Assem.* 739.

It is contended, also, that no offence was committed in Mercer county, since the defendants were served with process in Bergen county.    Upon that subject we desire to add nothing to what has been stated by the Supreme Court, in the opinion of Mr. Justice Bergen, on the motion to quash the indictment.    *State v. Brewster, supra.*

The *ratio decidendi* was "that the place of service is not material, for the offence was not complete until refusal to appear and be sworn at the place named in the summons." *Noyes* v. *State,* 41 *N. J. L.* 418.

The final and most serious contention of the defendants is that upon which the Supreme Court based its reversal of the judgment, *i. e.,* "the committee never authorized the issue of summons to the plaintiffs in error."

In this the court below fell into error.    The summons was admittedly issued by the chairman of the committee, and if it were necessary to rest our decision of the case upon the power of the chairman to issue the process, it might be insisted, as a matter of judicial knowledge, that the practice has been quite general in the conduct of legislative investigations, for the chairman of the committee, in conjunction with

its counsel, to select the names and the number of witnesses, for attendance at each session, and for the chairman to sign the summons for each witness when presented to him by counsel for the committee.

It is laid down by Cushing that where the power exists in the committee "any witness may be summoned by the chairman to appear before the committee and to bring with him all such documents as he may be directed to bring for the use of the committee." *Prac. Leg. Assem.* 739.

The federal congress, acting upon this principle in 1837, sustained the service of a subpœna signed by the chairman of the committee, in the case of Reuben F. Whitney, which was thus challenged. A similar exercise of power by the chairman was sustained by congress, in the case of the investigation of the Bank of the United States, at Philadelphia, during the administration of President Jackson. 2 *Hurd Prec.* 4540.

But we find that the record in the case furnishes ample support for the claim that the action of the chairman, in this particular, had not only the cognizance of the committee but also its assent.

At page 48 of the case, Senator Hennessy, the chairman of the committee, testified: "My recollection is that the committee discussed at more than one session, informally, they discussed the question of issuing subpœnas for these witnesses. I have no recollection of a specific meeting. I cannot, specifically, recall a meeting at which specific authority was issued for this purpose. The understanding was that the chairman of the committee issue the subpœnas."

At page 49 of the record he reiterates: "These matters were discussed, informally, and my recollection is that an agreement was in each case arrived at as to what witnesses were to be subpœnaed."

This authority was subsequently recognized, supplemented and ratified by the resolution of the committee, requiring the arrest of the defendants, the preamble of which recites: "Whereas, by order of this committee, George M. Brewster and Walter Scott have been summoned to appear, &c., by summons in writing," &c.

The authority of the committee to sit and investigate was derived from the joint resolution which, for its purposes, voiced the will of the law-making body, and not from any prior legislation, bearing generally upon the powers of legislative committees. Sections 63 and 64 of "An act concerning evidence" (*Pamph. L.* 1875, *p.* 26; 2 *Comp. Stat., pp.* 2217, 2239), may well be considered as a standing enactment, in aid of legislative committees appointed, as is sometimes the case, without specified powers contained in the appointing resolution.

Auxiliary legislation of that character, in such a situation, is then necessary for the purpose of executing the legislative will. Twenty years after the passage of that act, it was found necessary to enact the statute of 1895, manifestly in furtherance of a legislative policy of facilitating investigations, and of expeditiously pursuing contumacious witnesses; and of obviating the delay incident to a prosecution at the legislative bar, as well as to empower the courts to deal with the offence in a manner practically as summary as it might be dealt with under parliamentary rules, and upon evidence substantially similar to that which, under established parliamentary precedents, and the rules of evidence, would result in invoking the legislative judgment.

From these considerations we conclude that the process which was served upon the defendants was the summons of the legislative committee, the willful disregard of which constitutes the misdemeanor created by the statute, to which reference has been made.

We have not overlooked the fact that there is a more fundamental inquiry presented by the case, which may be broadly stated to be, whether the process of a legislative committee can be attacked or inquired into collaterally by one who has disobeyed its mandate.

It has been held that a witness who appears in obedience to a subpœna from such a body cannot question the committee's power to issue it, and *a fortiori* cannot *aliunde* show that the process was not in fact issued by the committee. *Wilckens* v. *Willet,* 1 *Keyes (N. Y.)* 521; *Lowe* v. *Summers,* 69 *Mo.*

*App.* 637; *Ex parte McCarthy,* 29 *Cal.* 395; 40 *Cyc.* 2196, and cases cited.

Upon grounds of public policy, based fundamentally upon *argumentum ab inconvenienti,* courts have not tolerated the setting up of the judgment of the witness, as to the necessity for his attendance, or as to. the legality of the committee, for the purpose of excusing his non-attendance.

So, a witness cannot excuse his failure to attend on the ground that the pleadings in the case are insufficient. *Fairfield* v. *United States,* 146 *Fed. Rep.* 508; 76 *C. C. A.* 590.

Or that the testimony is immaterial or irrelevant. *Robb* v. *McDonald,* 29 *Iowa* 330; *Deadman* v. *Ewen,* 27 *U. C. Q. B.* 176; *Mitchell's Case,* 12 *Abb. Pr.* (*N. Y.*) 249; 40 *Cyc.* 2176, and cases.

The rationale of the doctrine was emphatically expressed as follows by Lord Erskine in *Burdett* v. *Colman,* 14 *East* 163; also 5 *Dow Parl. Rep.* 165, 202. The case presented the parliamentary proceedings against Sir Francis Burdett, who was charged with uttering a libel against the house of commons. "The House of Commons, whether a Court or not, must, like every other tribunal, have the power to protect itself from obstruction and insult, and to maintain its dignity and character. If the dignity of the law is not sustained, it's sun is set, never to be lighted up again." To the same effect is *Burdett* v. *Abbott,* 14 *East* 1.

In the case of *Anderson* v. *Dunn,* 6 *Wheat.* (*U. S.*) 204, which was an action of trespass against the sergeant-at-arms of the house of representatives for false imprisonment, executed in pursuance of a resolution of the house for a contempt of its rules and dignity, the then Attorney-General Wirt argued that "the necessity of self-defence is as incidental to legislative, as to judicial authority.

"This power is not a substantive provision of the common law adopted by us; it is rather a principle of universal law growing out of the natural right of self-defence belonging to all persons. The general grant of judicial powers to the courts of the United States does not exclude the other branches of the government from the exercise of certain portions of judi-

cial authority. The different departments of the government could not be divided in this exact, artificial manner. They all run into each other. Even the president, though his functions are principally executive, has a portion of legislative power; and the congress is invested with certain portions of judicial power. * * * A legislative body has, from the necessity of the case, a right to commit persons for contempt, in breach of their privileges; that they are the exclusive judges whether those privileges have been violated, in the particular instance; and that their decisions upon the subject cannot be questioned in any other court or place."

The Supreme Court, in that case, emphasized the legal correctness of these views by declaring: "If there is one maxim which necessarily rides over all others, in the practical application of government, it is that the public functionaries must be left at liberty to exercise powers which the people have entrusted to them."

To the same effect, see *Falvey v. Massing,* 7 *Wis.* 630, and *Ex parte Nugent,* 4 *Pa. L. J. Rep.* 220, District of Columbia.

In *Kilbourn* v. *Thompson,* 103 *U. S.* 168, the United States Supreme Court, in 1880, is supposed to question the broad liberality of the opinion in *Anderson* v. *Dunn, supra,* but the limitation, if any, imposed by the later decision, is that contained in this language of the opinion of Mr. Justice Miller, by which it is made obvious that the case there *sub judice,* was determined only upon the consideration that "the whole plea shows the house was without authority in the matter." That such was the only differentiation is made clear by the language of Chief Justice Fuller in *In re Chapman,* 166 *U. S.* 661. There the question was in some respects identical with that presented in the case at bar. The defendant was indicted and convicted, under *U. S. Rev. Stat., p.* 102, for refusing to testify before a committee of the United States senate. The learned Chief Justice there held that Kilbourn *v.* Thompson was authority for the proposition "that there exists no general power in congress, or in either house, to make inquiry into the private affairs of a citizen." But, he

declared, "the refusal to answer pertinent questions in a matter of inquiry, within the jurisdiction of the senate, of course, constitutes a contempt of that body, and by the statute this is also made an offence against the United States."

The question of authority of the investigating committee manifestly, therefore, was resolved into a question of the jurisdiction of the appointing body, and the rule enunciated in Anderson *v.* Dunn remained unshaken, so that process possessing all the *indicia* of regularity issued by a legislative committee could not be attacked or questioned by a refractory witness for matters *aliunde.*

It must be perceived, that like any other legislative enactment, the joint resolution of the legislature, and its necessary legal incidents, are impregnable against collateral attack, and that it is the duty of co-ordinate branches of government to presume that the legislature, and its committee, invested with *quasi*-judicial powers, have acted within their legitimate scope and province, until the contrary be made to appear by strong and convincing reasons. *State* v. *Philips (Supreme Court, Maine),* 78 *Atl. Rep.* 283.

"It is but a decent respect," said the United States Supreme Court in *Ogden* v. *Saunders,* 12 *Wheat.* 213, 270, "due to the wisdom, the integrity and the patriotism of the legislative ·body, by which any law is passed, to presume in favor of its validity, until its violation is proved beyond all reasonable doubt."

Whether this immunity from collateral attack is so intimately connected with the absence of appeal that it applies only to the action of the legislative body itself, or whether it can be applied to the same subject-matter when cast in the form of an indictable misdemeanor, to be dealt with by the ordinary courts of law, are questions, the decision of which are not essential to the determination of the case now before the court.

For the reasons given the judgment of the Supreme Court will be reversed and the judgment of the Mercer Sessions will be affirmed.

*For affirmance*—None.

*For reversal*—The Chancellor, Garrison, Trenchard, Parker, Minturn, Black, White, Heppenheimer, Williams, Taylor, Gardner, JJ. 11.